UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
        :

PROCESS AMERICA, INC.,        :    **DECISION AND ORDER**
        :

        Plaintiff,        :    12 Civ. 772 (BMC)
        :

        - against -        :
        :

CYNERGY HOLDINGS, LLC, et al.,        :
        :

        Defendants.        :

-------------------------------------------------------- X

**COGAN,** District Judge.

In its Memorandum and Order of September 23, 2013 (the "prior order" or "prior decision"), the Court denied plaintiff Process America's motion for summary judgment, and granted in part and denied in part defendant Cynergy's cross-motion for summary judgment. The prior decision consisted of two principal holdings.

First, the Court held that the Independent Sales Organization Agreement (the "ISO Agreement" or the "Agreement") between Process America and Cynergy was unambiguous, and that under its terms, Process America did not own the merchant portfolio as of May 2007. Rather, Process America owned only a right to exercise ownership and transfer ownership rights from Cynergy. Because Process America never exercised those rights, Cynergy retained ownership over the portfolio.

Second, the Court held that (1) if Process America breached the ISO Contract by retaining merchant funds in violation of the rules promulgated by Visa and MasterCard (the "Rules"), such breach was material; but (2) an issue of fact existed as to whether Process America did indeed violate those Rules, because it was unclear whether the funds it maintained

through its Chargeback Reduction Incentive Program ("CRIP")[1] actually constituted a merchant reserve forbidden by the Rules or were, as Process America claimed, a permissible system by which it used its own residuals to protect against merchant losses.

Currently before the Court are cross-motions for reconsideration of the Court's prior decision, and for summary judgment as to the remaining claims and counterclaims not addressed therein. Specifically, Process America moves for reconsideration of the Court's ruling on the ownership of the merchant portfolio, and Cynergy moves for reconsideration of the Court's decision denying summary judgment as to the CRIP's violation of the Visa and MasterCard Rules. The Court requested supplementary briefing as to the issue of whether Cynergy was required to provide notice and opportunity to cure before terminating Process America's residuals, and if so, whether it provided such notice. Familiarity with the facts, procedural history, and the prior decisions of this Court is assumed. For the reasons that follow, the parties' cross-motions for summary judgment are granted in part and denied in part.

## DISCUSSION

### I.   Legal Standard

Motions for reconsideration are committed to the sound discretion of the district court. See, e.g., Patterson v. U.S., No. 04 Civ. 3170, 2006 WL 2067036, at *1 (S.D.N.Y. July 26, 2006). Reconsideration should be granted only where "the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

---

[1] As noted in the prior opinion, this program was known by various other names during the relevant period; for convenience, the Court will refer to it as the CRIP.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[2] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

## II.    Analysis

### A.  Ownership of the Merchant Portfolio

Process America argues that the Court's previous decision overlooked material facts in two respects.  First, Process America argues that the Court failed to consider Section 7.11 of the ISO Agreement, which provides that certain sections of the ISO Agreement survive its termination.  Second, Process America argues that the Court overlooked Process America's role under the ISO Agreement.

The latter argument is easily disposed of.  Process America argues that the Court's interpretation of the general purpose of the agreement – to provide "credit and debit card processing services to merchants" – was "one-sided" because it did not give "equal parity to the parties under the ISO Agreement," and minimized Process America's role in the Agreement to solicit, service, and reference merchants.  This argument is little more than a disagreement with the Court's previous ruling.  The prior decision explicitly considered, at some length, the general purpose of the ISO Agreement and the role of Process America therein.  See, e.g., Prior Decision at 6-7; 9-11.  And in any event, Process America cites no authority requiring that contractual interpretations confer "equal parity" on the parties.  Parties may eagerly enter into contracts that

---

[2] Cynergy argues that all of the facts in its 56.1 Statement should be deemed admitted because Process America's initial 56.1 Response did not comply with Local Rule 56.1  The Court declines to exercise its discretion to do so. See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73-74 (2d Cir. 2001).  Between Process America's amended 56.1 statement submitted with its Reply and the record citations contained in its memoranda of law, Process America has adequately pointed the Court to the portions of the record it believes to support its arguments.

contain unequal terms in order to take advantage of business opportunities they otherwise could not.  Indeed, as the previous decision noted, citing the Recital in the ISO Agreement, "Process America could not process merchants' transactions itself" because "it lacked Cynergy's relationships with sponsor banks."  Prior Decision at 7.

The Court similarly did not overlook Section 7.11 of the ISO Agreement.  Process America correctly notes that Section 7.11 specifically enumerates Section 2.6 as a clause that survives termination of the ISO Agreement.  Process America argues that if the only way it could perfect its ownership rights was by transferring its vested rights to the merchant portfolio away from Cynergy pursuant to Section 2.6.B, Section 7.11 is rendered superfluous, because "there would never be an occasion by which Process America could exercise the § 7.11 survival protection of its § 2.6A vested ownership rights."

As the prior decision pointed out, however, "'ownership' of the merchant portfolio under the ISO Agreement is not a unitary concept," and under Section 2.6.B, Process America could have sold the "ownership interest it had secured at that point – namely, its right to exercise ownership."  Prior Decision at 8.  Similarly, there is no reason why the right to exercise ownership, vested in Process America under Section 2.6.A, should not survive termination as provided by Section 7.11; thus, the Court's interpretation of the ISO Agreement gives rise to no contradictions.  Indeed, it is not clear that the parties even disagree about this interpretation.  Compare Cynergy's Reply at 22 ("Process America could have exercised its vested right after termination of the ISO Contract.") with Process America's Reply at 14 ("§ 7.11 at minimum demonstrates that Process America retains at least some interest in the merchant portfolio.").  Process America's motion for reconsideration is therefore denied.

B.  Whether the CRIP Violated the Rules

Before considering this issue, it is worthwhile to describe the record upon which the Court based its prior decision.  At the pre-motion conference held on February 12, 2013, the Court limited the parties briefing to two issues: construction of the ISO contract, and whether any of the alleged breaches were material.[3]  The parties were not instructed to brief the issue of whether any breach had in fact occurred.

Despite this instruction, both parties briefed the issue of breach to some extent.  Process America provided significantly more briefing, including citing to the report of their expert, while Cynergy merely cited to some deposition testimony and pointed out that the issue was not properly before the Court at the time.  Because the existence of a breach is a necessary prerequisite for any breach to be material, it is understandable that the parties would provide some extraneous briefing to properly frame their materiality arguments, and the Court does not fault either party for doing so.  However, the Court should not have ruled on the issue without a full evidentiary record, and in particular should not have faulted Cynergy's Reply as "inadequate," Prior Decision at 16-17, where the Court's own instructions would have led Cynergy to believe a more fulsome response unnecessary.

Thus, in its prior order, the Court clearly overlooked its limitation of the issues to be briefed.  This is a matter that "that might reasonably be expected to alter the conclusion reached by the court," Shrader, 70 F.3d at 257.  The Court will therefore reconsider its holding that fact issues prevented a summary judgment ruling on breach, and considers the issue anew in light of the full record now submitted by the parties.[4]

---

[3] See, e.g., Tr. of 2/12/2013 Conf. at 32:3-6 ("THE COURT:  Let's have that motion only . . . . In other words, we'll have cross-motions just on the construction of the contract and whether if there were any breaches they were material.").

[4] Both parties have primarily briefed the issue of breach as a motion for summary judgment, rather than reconsideration.

On this motion, plaintiff again cites the testimony of its expert, who opines that the CRIP did not "technically" violate the Visa or MasterCard Rules because the program was funded through Process America's residuals, although the program was "atypical" and "inconsistent with the customary relationship between an ISO and its Merchants." Plaintiff also cites to testimony by Process America executives who also believed the CRIP did not involve Process America holding merchant funds. Plaintiff further argues that Cynergy was well aware of the CRIP from its inception, and that Visa audited Process America in 2009 and did not flag the CRIP as a concern.

Cynergy, meanwhile, cites to the testimony of another Process America employee, Ruth Elasri, who stated that she now realizes the CRIP violated Visa and MasterCard rules, although she did not know it at the time. Cynergy also cites to the testimony of several of its own executives, who express their opinions that the CRIP constituted a merchant reserve; testimony by several merchants, who believed the same; and to a letter from Cynergy's sponsor bank, Moneris, which described the CRIP as a merchant reserve. Most crucially, Cynergy has now provided the Court with the actual forms used by Process America to sign merchants up for its retention program.

Much of the above evidence is irrelevant to establishing whether the CRIP was a breach of the Rules and the Agreement. "Where the terms of an agreement are clear and unambiguous, courts do not look beyond the four corners of the agreement, and parol evidence of the parties' intentions is inadmissible." GPIF-I Equity Co., Ltd. v. HDG Mansur Inv. Servs., Inc., No. 13 Civ. 547, 2013 WL 3989041, at *6 (S.D.N.Y. Aug. 1, 2013). But even if the Court were to consider extrinsic evidence, the post-hoc and often self-serving testimony of the parties' witnesses "as to their subjective interpretations of the contract. . . . [is] of little value to the

Court's present analysis of the Agreement." JA Apparel Corp. v. Abboud, 682 F. Supp. 2d 294,

306 n. 10 (S.D.N.Y. 2010).  As Learned Hand famously stated:

> A contract has, strictly speaking, nothing to do with the personal, or individual,
> intent of the parties.  A contract is an obligation attached by the mere force of law
> to certain acts of the parties, usually words, which ordinarily accompany and
> represent a known intent.  If, however, it were proved by twenty bishops that
> either party, when he used the words, intended something else than the usual
> meaning which the law imposes upon them, he would still be held, unless there
> were some mutual mistake, or something else of the sort.

Hotchkiss v. National City Bank, 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, D.J.).  The parties'

varying opinions on the meaning of the contract are therefore of no moment.

The CRIP forms submitted by Cynergy, however, are another matter.  It is undisputed

that these forms were based on the forms that Cynergy used to establish its reserves.  Indeed, the

earliest versions of these forms were entitled "Merchant Reserve Acknowledgment," though this

was later changed to "Merchant Retention Acknowledgment."  The precise language of these

forms varied somewhat over the relevant time period, but they all contained the following

material terms.

First, each form states that Process America has the authority to establish a retention (or

"reserve") account "in accordance with Section 7.B of the Merchant Processing Agreement."

Section 7.B of the Merchant Processing Agreement ("MPA") is entitled "Reserve Account" and

explicitly addresses the establishment of a reserve to be held in a non-interest bearing deposit

account at the sponsor bank.  Second, each form states that the retention (or reserve) account

may be established either by "a certified check made payable to Process America" or by

withholding a certain percentage from each gross deposit.  Third, each form states that the

retention account will be used "to offset any amounts owed by the Merchant under the MPA"

and that the "Merchant will forward to Process America funds to replenish the retention account

if any funds are debited from it." Fourth, the forms state that "[t]he balance of the retention

account, if any, will be returned to the Merchant up to 270 days after the termination of the MPA

or [the] Merchant's last transmission of sales drafts, whichever is later." Finally, the forms state

that in the event of conflict between its terms and the terms of the MPA, the MPA will govern.

These forms are unambiguous, and they establish that Process America was holding

merchant funds in violation of the Rules. Each form incorporated by reference Section 7.B of

the MPA, dealing with reserves to be held at the sponsor bank, and further followed the terms of

Section 7.B by referencing a 270 day period before the balance of funds would be returned to the

merchant. Each form gave the merchant the option of paying into the CRIP by writing a check

directly to Process America. And each form required the merchant to replenish the retention

account if any funds were debited from it.

None of these explicit and unambiguous contractual terms are consistent with plaintiff's

portrayal of the CRIP as a voluntary rebate program funded solely by Process America's own

residuals. There is no reference in any of these forms to residuals, rebates, or anything

suggesting that the money belonged to Process America rather than the merchant. Indeed, the

forms state that the balance of the retention account will be "returned" to the merchant after a

certain period, implying that the money still belonged to the merchant. According to these

forms, the CRIP funds had but one use – offsetting "amounts owed by the Merchant under the

MPA." Moreover, the forms provide two methods by which Process America could receive

money *directly* from merchants, rather than filtered through higher residuals – the merchant

could pay Process America directly by check, or be required to replenish the account if funds are

debited from it. Neither is consistent with Process America's description of the CRIP; if the

8

money truly belonged to Process America, there is no reason why a merchant should be required to replenish it.

Although Process America argues that the CRIP was a "rebate program . . . from its inception," the only document in the record that describes the CRIP in such terms is an "addendum to the Merchant Retention Acknowledgement" that Process America circulated to its merchants in early February 2011, just days before Cynergy terminated the ISO Agreement on February 17, 2011.  The addendum states that through its "Merchant Rebate Program," Process America "rebates money to [the merchant] that was earned off [the merchant's] credit card processing" and has "sole discretion" to "determine the rebate percentage based on [the merchant's] processing history."  The addendum adds that it "supersedes any other signed document related to Rebates and / or Retention."  This addendum is the earliest document in the record that refers to rebates, residuals, or suggests that Process America had discretion in determining what it paid to merchants under the CRIP.

The Court is mindful that it must draw all inferences in plaintiff's favor in weighing defendant's motion for summary judgment.  However, there is but one inference that can be drawn from the addendum – that prior to February 2011, Process America's agreements with merchants did not include the terms set forth in the addendum.  The addendum would be entirely superfluous otherwise, particularly its statement that it supersedes the prior retention documents.

Process America has no real explanation for any of these forms, other than to dismiss them as "inartfully labeled or referenced."  That is insufficient.  The forms unambiguously demonstrate that the agreements between Process America and the merchants contemplated that Process America would receive and hold merchant funds, even allowing for the possibility that the merchants would pay those funds directly to Process America.

Considering the actual agreements between Process America and its merchants makes it clear that the CRIP violated the Rules. The Visa Rules state, for example, that acquirers[5] "must hold and control merchant reserves;" they "must hold and control reserves that are accumulated and derived from the merchant settlement funds or used to guarantee a merchant's Visa payment system obligations;" and agents like Process America "are not permitted to access and control merchant funds." Moreover, although the parties have not cited it either in this motion or the last, the Glossary to the Visa Rules defines "Merchant Reserves" as "[f]unds held in an account or otherwise secured for use in offsetting potential merchant losses" – exactly the purpose of the CRIP funds as stated on the relevant forms. The MasterCard Rules similarly provide that "Member Service Providers" including ISOs like Process America "must not have access to any account for funds then or subsequently due to a merchant for Program participation and/or funds withheld from a merchant for chargebacks arising out of Program participation" and that "[d]iscount rates . . . due from a merchant must be collected only by the member and may not be collected by the [member service provider]."

Process America's remaining arguments are not persuasive. That Visa audited Process America and said nothing about the CRIP is not evidence that Visa approved it or believed it to comply with the Rules, especially absent evidence that Visa had actual knowledge about the CRIP. Next, as previously held, Process America's argument that Cynergy was aware of the CRIP "ignores Section 7.5 of the ISO Agreement, which provides that a party does not waive a right under the contract by failing or delaying to exercise that right." Prior Decision at 13.

---

[5] In the context of the Visa and MasterCard Rules, the terms "acquirer" and "member" encompass sponsor banks like Harris / Moneris.

Process America also argues that it needed to establish the CRIP because otherwise, as a Liability ISO,[6] it was fully exposed to losses from high-risk merchants.  This is a *non sequitor*, amounting to an argument that Process America had good business reasons for violating the Rules.  Process America's expert characterizes the CRIP as a "variation" on a common industry practice whereby "Liability ISOs in the high-risk market . . . demand indemnification agreements from their Merchants," and Process America points out that neither the ISO Agreement nor the Rules prohibit them from entering into indemnification agreements with their merchants.  This may be true, but as should be clear from the discussion above, the actual CRIP forms do not at all resemble indemnity agreements.[7]  Moreover, this argument inadvertently reveals an alternative solution to the problem:  Process America could have simply demanded indemnification from its merchants, rather than risk violating the Rules through what even their own expert describes as an "atypical" program.  Assumption of high risks in a business transaction may be a mistake, especially in hindsight, but the choice to assume those risks has no bearing on plain contractual language.

### C.   Cynergy's Termination of the ISO Agreement and Withholding Residuals

The Court has held that the CRIP was a breach of the ISO Agreement.  But the question remains whether that breach justified Cynergy's termination of the ISO Agreement and cessation of residual payments.  Process America argues that Cynergy breached the ISO Agreement by (1) improperly terminating the Agreement without proper notice and opportunity to cure and (2) improperly withholding Process America's residuals.  These arguments are closely intertwined. The Court agrees that, despite Process America's breach of the ISO Agreement through the

---

[6] As plaintiff's expert explains, a Liability ISO is an ISO who has assumed all liability of the Acquiring Bank and Processor for losses under the Merchant Agreements.  Pursuant to § 3.11.B of the ISO Agreement, Process America was a Liability ISO responsible for 100% of merchant losses incurred by Cynergy or the sponsor bank.

[7] For one thing, the words "indemnity," "indemnify" or any variations thereof do not appear.

CRIP, Cynergy did not comply with the procedures required by the contract for terminating the Agreement and Process America's residual payments.

Section 6.2 of the ISO Agreement describes the circumstances under which a party may terminate the ISO Agreement – Section 6.2.B addresses termination without cause,[8] and Section 6.2.C addresses termination for cause.  Section 6.3 lists "Event[s] of Default" that would permit either party to terminate the ISO Agreement "for cause" pursuant to Section 6.2.C.  At issue here are three particular Events of Default under Section 6.3:

> C. <u>False Representation</u>. Any representation or warranty made by either party or any of its employees, officers, or directors proves to have been false or misleading in any material respect as of the date made, or becomes false or misleading at any time.

> D. <u>Breach</u>. Either party fails to observe any material obligation specified in this Agreement, and such failure is not cured within 30 days of receipt of written notice thereof from the non-breaching party. Notwithstanding the previous sentence, the fourth such breach automatically will be deemed an Event of Default without the opportunity to cure.

> E. <u>Goodwill</u>. ISO engages in any act or omission that may damage the reputation, business, or goodwill of Cynergy Data.

As for residuals, the ISO Agreement explicitly contemplated that Cynergy would keep making residual payments to Process America after the termination of the Agreement.  However, Process America's contractual right to receive post-termination residual payments came with an important limitation, set forth in two separate Sections of the Agreement.  Section 5.1 of the ISO Agreement provides that Process America "will receive such Compensation for as long as Cynergy Data receives revenue attributable to Merchants; <u>provided, however, that the Compensation will cease upon termination of this Agreement by Cynergy Data due to ISO's</u>

---

[8] "Termination Without Cause: Either party may terminate this Agreement at the end of the Initial Term or any Renewal Term upon written notice of termination to the other party at least 90 days prior to the end of the Initial Term or any Renewal Term."

breach of any material term of this Agreement."[9] (emphasis added.)  Section 6.4 of the

Agreement, entitled "Post-Termination Rights," similarly provides that:

> No termination of this Agreement will affect any right of ISO or Cynergy Data with regard to the collection of Compensation or fees owed. The Compensation will be due to ISO for as long as Cynergy Data is deriving revenue from any Merchant, unless the Agreement is terminated by Cynergy Data due to a material breach of the Agreement by ISO."

 (Emphasis added).

Cynergy argues that, pursuant to Sections 5.1 and 6.4, it was entitled to withhold

residuals because it terminated the ISO Agreement on February 17, 2011 due to Process

America's material breach.[10]  Cynergy terminated the ISO Agreement by letter dated February

17, 2011 (the "termination letter").  That letter is equivocal as to the basis for the termination,

and bears excerpting in relevant part:

> We hereby notify you that we find you in material breach of the Agreement. Among other provisions, we find that you have breached your representations and warranties under Sections 4.1 F (No Violation) and 4.1 G (Compliance). These breaches stem from your withholding and maintaining

---

[9] Throughout the Agreement, "ISO" refers to Process America, and "Compensation" refers to residual payments.

[10] The parties' briefing is ambiguous as to whether there is a factual dispute over precisely when Cynergy began withholding residuals.  Under Section 5.1 of the ISO Agreement, monthly residual payments were due "on or about the twentieth calendar day" of the following month.  Thus, as relevant here, Process America's residual payments for the month of December 2010 would have been due on or about January 20, 2011.

Process America states that Cynergy "withheld Process America's earned residuals commencing January 2011 (which would have been residuals that were earned on transactions processed in December 2010)," and cites to the deposition testimony of Process America's Keith Phillips, which is in support, although not unambiguously so.  But Cynergy's brief argues only that Cynergy terminated the ISO Agreement on February 17, 2011, and "[a]s of that date, Process America had no right to receive . . . residual compensation."  The parties' 56.1 statements do not provide further clarity – in response to Process America's statement that "In January 2011, . . . Cynergy stopped paying Process America its earned residuals," Cynergy states that it "does not refute that it did not pay Process America January 2011 residuals."  Cynergy's 56.1 Statement states that it stopped paying residuals "in January 2011," and cites to the deposition testimony of Nancy Disman, who stated that the residual payments stopped in January 2011 but Cynergy paid Process America its residuals from December 2010.

This should be a relatively simple issue to resolve.  But the parties' submissions are insufficient for the Court to determine whether Cynergy made the January 2011 residual payment, or even whether the parties actually disagree on this point.  The cross motions for summary judgment as to whether Cynergy improperly withheld the December 2010 residuals are therefore denied.  This issue will be resolved at trial for damages.

merchant funds in reserve in violation of the Rules. Naming a reserve an insurance program merely obfuscates the facts but does not lessen the violation or the breach. Further, we find that you are in material default pursuant to Sections 6.3 C (False Representation), 6.3 D (Breach) and 6.3 E (Goodwill) also in relation to your withholding and maintaining merchant funds as a reserve. As a result of the Section 6.3.C and 6.3E events, we hereby terminate the Agreement immediately and intend to fully enforce ramifications upon termination.

Despite the Events of Default that we believe to be irrefutable, pursuant to Section 6.2B of the Agreement by providing notice ninety days prior to the renewal date, either party may choose not to renew the Agreement and as such we hereby provide notice of non-renewal. To be clear, this notice is not relief from your Events of Default but clear notice that we shall ensure your contract will not continue.

This letter is provided in accordance with the notice provisions of Section 7.2 of the Agreement.

In sum, the termination letter states that Process America is in material breach of the ISO Agreement, and that a Section 6.3.D Event of Default has occurred – which would require 30 days written notice and an opportunity to cure if Cynergy sought to terminate the contract on this basis – but purports to terminate the contract "immediately" based on default events under Sections 6.3.C and 6.3.E, which do not provide for a cure period. The letter simultaneously gives notice of Cynergy's intent not to renew the ISO Agreement in ninety days, as required for a termination "without cause" under Section 6.2.B.

At the heart of the parties' dispute is the question of how the provisions in Sections 5.1 and 6.4 that address the cessation of residual payments should be interpreted. Again, those terms provide that Cynergy may stop paying residuals if it terminates due to a "breach of any material term of this Agreement" or "a material breach of the Agreement" by Process America. If an Event of Default under 6.3.C ("False Representation") or 6.3.E ("Goodwill") qualifies as a "material breach" under 5.1 and 6.4, Cynergy would be entitled to withhold residuals regardless of whether it provided Process America with notice and opportunity to cure. But if only a termination pursuant to a Section 6.3.D ("Breach") Event of Default would qualify as a

14

termination "due to a material breach," the Court will have to consider whether Cynergy complied with the notice and cure provisions set forth in Section 6.3.D. The Court concludes that Sections 5.1 and 6.4 can only reasonably be interpreted as referring to a termination pursuant to Section 6.3.D, and that Cynergy was therefore required to provide notice and opportunity to cure.

This conclusion rests on several bases. The most obvious is the plain language of the Agreement. Section 6.3.D is entitled "Breach" and both Sections 5.1 and 6.4 refer to termination by Cynergy due to a "breach." The parties could have drafted Sections 5.1 and 6.4 to refer to a "termination for cause," "default," "Event of Default" or any of a number of other terms. They did not, and instead chose the term "breach" in both instances. Indeed, elsewhere in the Agreement, the parties chose broader language in defining consequences of termination – Section 2.7 states that Process America's license to use certain software terminates automatically "upon termination of this Agreement for any reason." By contrast, Section 6.4 states essentially the opposite: "No termination of this Agreement will affect [Process America's right to receive residuals] . . . . unless the Agreement is terminated by Cynergy Data due to a material breach of the Agreement."

When interpreting a contract under New York law, the Court should give terms that are not defined in the contract their plain and ordinary meanings. See, e.g., Meda AB v. 3M Co., 969 F. Supp. 2d 360, 378 (S.D.N.Y. 2013) (citing Federal Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 568 (2d Cir. 2011)). Here, there is nothing to suggest that the term "breach" means something different in Sections 5.1 and 6.4 than in Section 6.3.D. Indeed, although Cynergy points out that each Section is phrased slightly differently, the language in Sections 5.1 and 6.4 closely tracks that of Section 6.3.D. Compare Section 5.1 ("breach of any material term of this

15

Agreement") <u>and</u> Section 6.4 ("a material breach of the Agreement") <u>with</u> Section 6.3.D (stating

that a "Breach" occurs when a party "fails to observe any material obligation specified in this

Agreement").  All of these formulations are in accord with the ordinary meaning of the term

"breach."  <u>See</u> Black's Law Dictionary (9th ed. 2009) (defining "breach of contract" as

"[v]iolation of a contractual obligation by failing to perform one's own promise, by repudiating

it, or by interfering with another party's performance.").  Thus, the most reasonable

interpretation of the Agreement is that the parties intended the term "breach" to have the same

meaning in all three Sections, and that Cynergy was therefore required to comply with Section

6.3.D before it could terminate due to a breach.

Considering Section 6.3 as a whole further supports the conclusion that Section 6.3.D is

exclusive means by which Cynergy could terminate the Agreement "due to a material breach."

Section 6.3 specifically defines "Breach" as a subset of the broader category of occurrences that

will constitute an "Event of Default" and justify termination for cause.  Under the logic of the

Agreement, therefore, "breach" must mean something narrower than "Event of Default."

Further, Section 6.3.D is the only Event of Default to use the term "breach," and it parallels

Sections 5.1 and 6.4 by limiting its application to a party's failure to observe obligations

"specified in this Agreement," just as Sections 5.1 and 6.4 also refer to breaches "of the

Agreement."

Cynergy resists this interpretation, and argues instead that *any* Event of Default under

Section 6.3 would constitute a "material breach" as defined in Sections 5.1 and 6.4.  Otherwise,

Cynergy argues, Cynergy could not terminate residual payments even if Process America failed

to make payments required under the contract (Section 6.3.A), became insolvent and filed for

bankruptcy (6.3.B), openly violated its representations and warranties (6.3.C.), or openly

disparaged or defamed Cynergy (6.3.E).  Therefore, Cynergy argues that the Court's construction of the Agreement should be rejected as "absurd."  See InterDigital Commc'ns Corp. v. Nokia Corp., 407 F. Supp. 2d 522, 530 (S.D.N.Y. 2005).

The significant overreach apparent in this argument demonstrates why Cynergy's interpretation must be rejected.  Plainly, not every Event of Default can qualify as a "breach of any material term" (Section 5.1) or a "material breach of the Agreement" (Section 6.4).  First, as set forth above, this interpretation finds no support in the plain language of the Agreement. Second, many of the Events of Default permit termination under circumstances that would not constitute a breach of contract under any ordinary meaning of the term.  For example, neither party contractually promised not to enter bankruptcy.  But under Cynergy's reading, a bankruptcy filing by either party would nonetheless be a breach of the Agreement pursuant to Section 6.3.B, permitting not only immediate termination, but also immediate cessation of residual payments and presumably, recovery of damages.

The remainder of Cynergy's parade of horribles similarly does not withstand scrutiny. Although Cynergy characterizes as Section 6.3.C as being triggered by a violation of representations and warranties in the Agreement, the provision is broader:  it refers to *any* false representation or warranty by either party, without limitation to those specified in the Agreement.  A violation of the representations or warranties in the Agreement could properly be dealt with as a breach under Section 6.3.D, while any post-contractual false representations could justify termination pursuant to 6.3.C.  Thus, rather than rendering 6.3.C superfluous, as Cynergy contends, the Court's interpretation of the contract gives effect to all of its provisions. Meanwhile, if Process America defamed Cynergy and damaged its goodwill, Cynergy could terminate the agreement and sue for defamation, just as it has in this case.

The only Event of Default besides Section 6.3.D that is limited to terms specifically included in the contract is 6.3.A, addressing non-payment.  Cynergy did not rely upon this provision in terminating the Agreement, and so it does not help Cynergy's argument that it was entitled to stop paying residuals.  Regardless, the Court observes that Section 6.3.A provides for a 90 day written notice and cure period, longer than the 30 days required by Section 6.3.D.  Thus any termination under Section 6.3.A would by definition also comply with 6.3.D, and the Court's interpretation creates no inconsistency between these provisions.

Indeed, Cynergy does not explain when, under its interpretation, it would *ever* be required to provide notice and opportunity to cure.  As noted, the provisions upon which Cynergy relies – Sections 6.3.C and 6.3.E – are quite broad.  By their terms, they permit Cynergy to terminate the Agreement based on *any* false representation or *any* act potentially harmful to Cynergy's "reputation, business or goodwill."  It is difficult to imagine any breach of the Agreement by Process America which could not also be construed as an Event of Default under one or the other of these Sections.  Cynergy essentially seeks to have its cake and eat it too; its reading of the contract grants itself a unilateral right to terminate the contract immediately, without notice, and with the same consequences as a termination with notice.  This interpretation renders 6.3.D superfluous.  The far more reasonable interpretation is that Section 6.3 gives the parties the contractual right to terminate the Agreement in certain circumstances that would not otherwise constitute a breach of contract, such as bankruptcy, but requires notice and opportunity to cure if a party wishes to terminate due to a breach.

At first blush, it might seem inconsistent to require notice and opportunity to cure for a termination based on a breach of the Agreement and not otherwise.  But this apparent inconsistency is resolved if one accepts that the consequences for a termination due to

18

contractual breach are significantly more severe.  Although Cynergy's right, pursuant to Section 6.3.E, to terminate the agreement immediately if Process America engaged in "any act or omission that may damage" its business or goodwill is broad and ill-defined, if Cynergy chose to exercise that right, it would have to keep paying residuals to Process America.  The extra protection of a notice and cure period where termination is due to a contractual breach makes sense if a Section 6.3.D termination is the only means by which Cynergy could terminate Process America's right to receive residuals.

Based upon the plain language of Sections 5.1, 6.3.D and 6.4, all of which refer to "breach" and some variation of the phrase "of the Agreement," and upon consideration of the various Events of Default in context, the Court holds that the Agreement unambiguously required Cynergy to the provide the written notice and cure period set forth in Section 6.3.D before it could terminate Process America's residual payments.

Having concluded that Cynergy was required to provide 30 days written notice and opportunity to cure before it could terminate the Agreement and withhold residuals, the Court turns to the question of whether Cynergy provided that notice.  "Under New York law, . . . . [w]here the contract specifies conditions precedent to the right of cancellation, the conditions must be complied with."  Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720, 727 (2d Cir. 1992) (collecting cases); see also Filmline (Cross–Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 518–19 (2d Cir. 1989) (describing "the clear New York rule requiring termination of a contract in accordance with its terms").  A termination that does not comply with contractual requirements is ineffective.  See, e.g., New Image Const., Inc. v. TDR Enters. Inc., 74 A.D.3d 680, 681, 905 N.Y.S.2d 56 (1st Dep't 2010) ("Defendants do not claim to have served plaintiff with a 14-day notice to cure and written notice of termination which were contractual

prerequisites to termination.  Defendants' purported termination of the contract was, therefore, ineffective.").

On its face, Cynergy's letter terminated the contract "immediately."  Cynergy nevertheless argues that it provided Process America with ample opportunities to cure its CRIP violation before February 2011, and that Process America was on "actual notice" that it could not hold merchant reserves.  Cynergy's evidence primarily consists of deposition testimony from Cynergy employees who testified that, beginning in 2009, they advised Process America that it could not hold merchant funds and made efforts to bring Process America into compliance.[11] This evidence is supplemented here and there by emails, including an April 2009 email from a Cynergy employee recapping a telephone conversation with Process America concerning the CRIP.

This evidence does not allow the Court to hold that Cynergy gave the required notice and opportunity to cure under Section 6.3.D of the ISO Agreement.  The recollections of Cynergy employees cannot suffice, as Section 6.3.D explicitly requires "written notice."  Even assuming notice via email could qualify as "written notice" –which is far from clear[12] – the record here is devoid of any written statements informing Process America that Cynergy considered the CRIP a material breach of the Agreement or that Cynergy was "was triggering the provisions under the [ISO] Agreement that would allow [Process America] an opportunity to cure any alleged defects."  USI Ins. Servs. LLC v. Miner, 801 F. Supp. 2d 175, 185 (S.D.N.Y. 2011).

---

[11] Process America counters with deposition testimony from its own employees, who effectively testified that Process America did everything Cynergy asked.

[12] Section 7.2 of the Agreement, entitled "Notice," sets specific requirements for "all communications under this Agreement," including that they be in writing, delivered in person or by courier, and addressed to the attention of the recipient's president.  While Cynergy's February 17, 2011 termination letter followed these requirements, the other communications that Cynergy cites as providing notice did not.

The April 2009 email is ambiguous, as it states that the "CRIP program can be continued as is, so long [sic] discount rates DO NOT represent a reserve amount potentially owed to merchants." (Emphasis in original).  The parties have competing interpretations of this email – Process America views it as an endorsement of the CRIP, Cynergy as a warning to cease holding merchant reserves.  But regardless of which interpretation is correct, this email cannot qualify as written notice pursuant to Section 6.3.D:  it neither references Section 6.3.D, describes the CRIP as a material breach, nor instructs Process America to cure the breach or else face termination.  Cynergy also cites an email of February 3, 2011 which, although more specific, is also insufficient because it only predated Cynergy's termination letter by fourteen days rather than the contractually-mandated thirty.  None of the other emails cited by Cynergy come close to providing the required notice and opportunity to cure.

There is no evidence that Cynergy complied with the notice and cure provisions of Section 6.3.D, and therefore Cynergy did not properly terminate the Agreement "due to a material breach."  As noted above, Cynergy's justification for withholding residuals is based entirely upon construing the February 2011 termination as a termination due to a material breach.  Because Cynergy did not properly terminate the contract due to a material breach, it was not entitled to withhold residuals.  Termination based on other Events of Default would not justify a cessation of residual payments under the ISO Agreement.  Accordingly, summary judgment is granted as to Process America's claim that Cynergy breached the ISO Agreement by improperly withholding residuals.

D.  Process America's Remaining Breach of Contract Claims

Count IV of the Amended Complaint also alleges that Cynergy materially breached the ISO Agreement in a number of other respects, including allegations that Cynergy failed to

properly compensate Process America for the merchant portfolio; failed to train Process America as required by the ISO Agreement and the Rules; wrongfully terminated Process America's access to the VIMAS system; and charged "erroneous and arbitrary" fees to Process America.

Process America's first claim is resolved by the Court's previous holdings.  Because Cynergy retained ownership rights over the merchant portfolio, the ISO Agreement did not require Cynergy to transfer the portfolio to Process America or compensate Process America for it.

Process America argues that Cynergy breached the ISO Agreement by failing to provide training with regard to merchant reserves.  This argument is without merit.  Section 2.3 of the ISO Agreement states only that "Cynergy Data will provide necessary training to ISO employees to enable such employees to service and sell credit and debit card processing services to Merchants."  There is no dispute that Process America received sufficient training to provide such services; rather, Process America's argument is that this provision also required Cynergy to train Process America to comply with the Rules.  But Section 2.3 contains no reference to training with regard to merchant reserves or compliance with the Rules more generally.  Instead, it quite unambiguously contemplates training individual Process America employees on the practicalities of boarding merchants under the Agreement.  Indeed, adopting Process America's interpretation of Section 2.3 would appear to create tension with Section 4.1.F of the Agreement, which holds each party responsible for its own compliance with the Rules.  As for the Rules themselves, Process America cites a provision of the Visa Rules stating that "Members" – referring to sponsor banks like Harris / Moneris, not Cynergy – must provide compliance training.  Process America provides no explanation as to why this provision would require Cynergy to provide such training, and this claim also fails.

Cynergy also did not breach the ISO Agreement by terminating Process America's access to the VIMAS system.[13]  It is undisputed that Cynergy blocked Process America's access to this system in July 2011.  Section 2.7 of the ISO Agreement gave Process America a license to use VIMAS, and provided that license would terminate automatically upon termination of the ISO Agreement "for any reason."  Although Cynergy's February 2011 letter did not constitute a proper termination "due to a breach" entitling Cynergy to withhold residuals, Section 2.7 does not limit Cynergy's right to terminate VIMAS access in the way that Sections 5.1 and 6.4 limit its right to cease residual payments.  Regardless of whether the February 2011 letter was a proper termination "for cause" pursuant to Sections 6.3.C and 6.3.E, the letter at the very least gave adequate notice of Cynergy's intent not to renew the ISO Agreement ninety days later, in May 2011, as required by Section 6.2.B.  Thus, at the latest, Cynergy effectively terminated the Agreement without cause as of May 2011, and Process America's license to use the VIMAS system terminated automatically at that point.

Process America also alleges that Cynergy breached the ISO Agreement by charging various erroneous fees.[14]  In presenting this argument in its opening memorandum, Process America did not cite any provision of the ISO Agreement, nor otherwise explain how these fees breached the Agreement.  For the first time, in its reply memorandum, Process America points to Section 3.11.A of the ISO Agreement.  Section 3.11.A, entitled "Merchant Losses," states:

> All Merchant Losses incurred by Cynergy Data, by ISO's brought to Cynergy Data by ISO or Member for any reason will be borne 100%, including but not limited to 100% of any amount incurred by Cynergy Data or Member arising out of ISO's or any ISO sales representatives' negligence or fraud.

---

[13] VIMAS is Cynergy's proprietary software application by which Cynergy and its sub-ISOs can monitor and manage merchant accounts.

[14] These include missing original files fees, Payment Card Industry (PCI) compliance fees; chargeback fees; retrieval fees; risk assessment fees; and others.

The first clause of Section 3.11.A is somewhat ambiguous; it is unclear by whom the Merchant Losses "will be borne 100%." According to Process America, Section 3.11 places all liability for Merchant Losses on Cynergy; therefore, charging Process America fees related to such losses breached the Agreement.

Process America's interpretation conflicts with the remainder of the ISO Agreement and many of its own arguments. Section 3.11.B provides that Cynergy shall deduct Merchant Losses from Process America's residuals, which is inconsistent with Process America's position that Cynergy was liable for Merchant Losses. Indeed, Process America acknowledges as much elsewhere in their briefing – for example, in justifying the CRIP, Process America states that it was a "Liability ISO" and "assumed 100% of all liability of Cynergy and the Sponsor Bank merchant losses." Process America's own expert confirms this interpretation, stating that under Sections 3.11.A and 3.11.B, Process America is a Liability ISO fully liable for merchant losses. Process America has not shown that Cynergy's fees violated Section 3.11 or any other provision of the ISO Agreement, and therefore Cynergy is entitled to summary judgment on this issue.[15]

### E.  EP / ISO Reserve & Breach of Bankruptcy Stipulation

As Process America's expert explains, an ISO Reserve, sometimes called an "Executive Partner" or "EP Reserve," is different from a merchant reserve in that it is designed to protect against losses caused not only by merchants, but also by the ISO itself. Section 3.11.C of the ISO Agreement provides for the establishment of an EP / ISO Reserve; Section 3.11.C.i states that the EP / ISO Reserve will be funded by amounts withheld from Process America's residuals and capped at $250,000, while Section 3.11.C.iii addresses termination. Section 3.11.C.iii provides that upon termination of the Agreement, Process America is required to deposit "the

---

[15] Process America also argues in passing that "Cynergy underfunded Process America's Merchant Accounts." Process America offers no factual support for this argument. Cynergy is therefore granted summary judgment as to this claim as well.

greater of either a) $10,000 or b) 1% of Merchants' dollar volume of Transactions during the

month previous to the month of termination, the remaining balance, if any, of which will be

returned within 270 days after termination of all Merchant Agreements."

Relatedly, in June 2010, Process America and New Cynergy entered into a stipulation

resolving certain claims related to Old Cynergy's bankruptcy, including a dispute related to

residuals withheld by Old Cynergy.  Paragraph 5 of the bankruptcy stipulation provides:

> The Debtors and Process America hereby confirm that no portion of the Process
> America Cure Payment constitutes merchant reserve funds. The Debtor withheld
> $1,538,866.25 from a prepetition residual payment owed to Process America for
> the purpose of establishing an EP/ISO Reserve. These funds that were previously
> held by the Debtor will continue to be held as Process America's EP/ISO Reserve
> with Cynergy/Pipeline at Comerica Bank for future portfolio growth security.

Process America alleged that, after termination of the ISO Agreement, Cynergy breached

the Agreement by failing to return the $250,000 EP / ISO Reserve, and breached the bankruptcy

stipulation by failing to return the $1,538,866.25.  Process America argues that the ISO

Agreement required Cynergy to return the EP / ISO Reserve funds – both the $250,000 held

pursuant to the ISO Agreement and the $1,538,866.25 held pursuant to the bankruptcy

stipulation – after termination.  As to the bankruptcy stipulation, Process America additionally

argues that due to the termination, "as a practical matter," there is no "future portfolio growth"

for which Process America's residuals should be held to provide security, and that Cynergy has

therefore breached the bankruptcy stipulation by failing to return the $1,538,866.25.

Process America has not raised an issue of fact as to whether Cynergy breached either the

ISO Agreement or the bankruptcy stipulation by failing to return the EP / ISO Reserves.  Section

3.11.C.iii directly addresses return of the EP / ISO funds, stating that the balance will be returned

270 days after termination of "all Merchant Agreements."  This provision refers to the

termination of all Merchant Agreements, and not to the termination of the ISO Agreement itself.

Cynergy argues, and Process America does not dispute, that all of the Merchant Agreements have not been terminated.  Therefore, Cynergy's obligation to return the balance of the $250,000 EP / ISO Reserve has not yet been triggered.  To the extent Process America bases its entitlement to the $1,538,866.25 EP / ISO Reserve on the ISO Agreement itself, that argument fails for the reasons just stated.  Further, Process America provides no support for its contention that it should not be responsible for merchants it no longer owns "as a practical matter" other than to state, in conclusory fashion, that this is so.

Process America originally also alleged that Cynergy breached the bankruptcy stipulation by moving the $1,538,866.25 from the Comerica bank account.  Cynergy moved for summary judgment on this claim, and Process America's opposition brief did not even reference it, much less provide legal argument or evidence in opposition.  Cynergy thus did not address this claim further in its own Reply, other than to argue that this claim was abandoned.  For the first time in its Reply, Process America states that it is entitled to summary judgment that Cynergy breached the bankruptcy stipulation by "moving the EP/ISO reserves and removing Process America's name" on the accounts at Comerica bank in which those funds were held.  Because Process America denied Cynergy an opportunity to respond to its evidence, and because "[a]rguments may not be made for the first time in a reply brief," Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993), the Court will not consider this argument.

But even if the Court were to consider the merits of this argument, it would fail.  The only evidentiary support Process America cites is the deposition of Keith Phillips, who testified only that Cynergy removed Process America's name from the account, and not that Cynergy moved the funds from Comerica entirely.  Even leaving aside that Process America's Amended Complaint does not allege this theory of breach, Process America has not pointed to any

26

provisions in the bankruptcy settlement addressing the name under which the EP / ISO Reserve

must be held.  Process America has failed to identify any disputed issues of fact as to Cynergy's

alleged failure to return the EP / ISO reserves, and summary judgment is therefore granted to

Cynergy as to this claim.

      F.   Process America's Tortious Interference Claim

Process America seeks summary judgment on Count Eight of the Amended Complaint,

alleging tortious interference with Process America's merchant contracts.  The Court's ruling

concerning ownership over the merchant portfolio mandates that this claim must fail.  Cynergy

remained a party to the merchant agreements at issue, and "a defendant cannot be liable for

tortious interference with a contract to which it is a party."  Getso v. Harvard Univ. Extension

Sch., No. 10 Civ. 4624, 2011 WL 135012, at *5 (S.D.N.Y. Jan. 13, 2011).[16]  The Court,

however, denies Cynergy's request to be compensated its attorneys' fees incurred in defending

this claim.  That the tortious interference claim was largely dependent on the Court's

determination of ownership over the merchant portfolio does not mean it was entirely frivolous,

and in any event the amount of extra work required to defend this claim should have been

negligible.

      G.   Process America's Lanham Act Claim

As for Process America's Lanham Act claim, in order to prevail on a claim of trademark

infringement pursuant to 15 U.S.C. § 1125(a), a plaintiff must establish that "(1) it has a valid

mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the

mark, (3) in commerce, (4) 'in connection with the sale . . . or advertising of goods or services,'

---

[16] To the extent Process America makes arguments related to Count Nine of the Amended Complaint, alleging tortious interference with prospective economic relations, those arguments have not been considered because Process America withdrew that claim at the February 12, 2013 conference.

(5) without the plaintiff's consent." 1–800 Contacts, Inc. v. WhenU.Com, 414 F.3d 400, 407 (2d Cir. 2005) (citations omitted).  Cynergy argues that Process America has not met its burden to show that Cynergy made commercial "use" of Process America's name; that Process America had a mark entitled to protection under the Lanham Act; or that Process America suffered any damages from what Cynergy describes as its accidental use of outdated forms which still featured Process America's logo.

Process America has failed to present any evidence demonstrating that its mark deserves trademark protection.  Process America argues that because its mark is "suggestive," rather than "descriptive," it is inherently distinctive and therefore entitled to protection under the Lanham Act without proof that it has acquired a secondary meaning in the minds of consumers.  This is an accurate statement of law insofar as "suggestive" marks do not require proof of secondary meaning, whereas "descriptive" marks do.  See, e.g., Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344-345 (2d Cir. 1999).  But "[t]he classification of a mark is a factual question."  Id. at 344 (citing Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1039-40 (2d Cir. 1992)).  More specifically,

> The factual issue presented is how the purchasing public views the mark.  The fact-finder is not the designated representative of the purchasing public, and the fact-finder's own perception of the mark is not the object of the inquiry.  Rather, the fact-finder's function is to determine, based on the evidence before it, what the perception of the purchasing public is.

Lane Capital, 192 F.3d at 344.

Here, rather than cite evidence in support of the argument that its mark is "suggestive," Process America merely states it to be so.  Process America has provided no evidence concerning other marks in the processing industry; how its mark is perceived by merchants or other consumers; or explain the ways in which the Process America mark is distinctive.  No reasonable fact-finder could find that Process America's mark is inherently distinctive without

28

improperly relying on their "own perception of the mark." Id.  Therefore, Cynergy is granted

summary judgment and Process America's Lanham Act claim is dismissed.

> H.  Process America's Claims for Quantum Meruit and Unjust Enrichment

Process America's claims for quantum meruit and unjust enrichment similarly fail.[17]

Although Process America is correct that quasi-contract claims may be pled in the alternative

alongside contractual claims, such pleading is permitted "where the agreement may not be

enforceable."  See Gate Techs., LLC v. Delphix Capital Markets, LLC, No. 12 Civ. 7075, 2013

WL 3455484, at *5 (S.D.N.Y. July 9, 2013).  Here, "neither party disputes the validity of the

agreement entered into between the parties," Velu v. Velocity Exp., Inc., 666 F. Supp. 2d 300,

309 (E.D.N.Y. 2009), and the Court therefore grants summary judgment to Cynergy as to Counts

Six and Seven of the Amended Complaint.

> I.  Cynergy's Counterclaim for Wrongful Solicitation

Section 3.8 of the ISO Agreement prohibits Process America from "directly or indirectly"

soliciting portfolio merchants during the term of the Agreement and for five years after its

termination.  In support of summary judgment, Cynergy cites deposition testimony from a

Process America employee, Michael Wolpin, who quite candidly stated, *inter alia*, that Process

America "did our best to preserve accounts that were ours by rights and we solicited those

[merchants] to join" Process America at Merrick Bank, including Cynergy merchants.  Wolpin

also emailed at least one merchant in February 2011, telling her to stop processing with Cynergy.

Cynergy also cites testimony from Mace Horowitz, who worked for one of Process America's

sales agents.  Horowitz testified that Craig Rickard, a Process America employee, gave him a list

---

[17] Under New York law, a court "may analyze quantum meruit and unjust enrichment together as a single quasi contract claim."  Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005).

of 15-20 Cynergy merchants to solicit to join the Process America / Merrick platform.  Cynergy corroborates this testimony with an example of one email sent by Mr. Horowitz to a merchant.

Process America has little in response to this evidence.  It first argues that any solicitation was permissible because it owned the merchant portfolio, an argument foreclosed by the Court's holding as to the ownership of the portfolio.  Process America also argues that Mr. Wolpin's testimony should be disregarded as inadmissible speculation.  This argument is simply inaccurate; Mr. Wolpin's testimony as to the solicitation of merchants by Process America's sales department was clearly based on his personal knowledge.

Process America also points out that Mr. Horowitz testified that he, and not any Process America employee, sent emails to merchants.  This argument is a *non sequitor*; Mr. Horowitz may have sent the emails himself, but Section 3.8 also forbids indirect solicitation.  And although Process America states in its 56.1 statement that it did not provide contact information for Cynergy merchants to Mr. Horowitz, it does not advance any arguments based on this fact in its memoranda of law.  In any event, the evidence Process America cites is not in support – when asked at his deposition whether he or any other Process America employee provided contact information for Cynergy merchants to Mr. Horowitz, Mr. Rickard testified that he could not recall.  Mr. Rickard's lack of recollection is insufficient to raise a factual issue, especially in light of Mr. Wolpin's explicit statements describing Process America's efforts to solicit Cynergy merchants.

Process America's remaining arguments fare no better.  Process America argues in passing that because Cynergy breached the ISO Agreement by withholding residuals and improperly terminating it, Cynergy has no right to enforce its terms.  The non-solicitation provision, however, expressly states that it survives for a period of five years after termination.

Finally, Process America states that Cynergy has failed to show that the increased attrition it experienced was due to Process America's solicitation rather than other factors, and that Cynergy's solicitation claim therefore fails. This argument goes to damages, rather than liability. No reasonable juror could fail to find that Process America breached Section 3.8 of the ISO Agreement. Cynergy is therefore granted summary judgment as to this claim.

> J.  Cynergy's Counterclaim for Defamation

Cynergy's Fourth Counterclaim alleges common law defamation. The elements of defamation under New York law are "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" Thai v. Cayre Grp., Ltd., 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010).

Cynergy provides evidence of allegedly defamatory statements made in 2011 to merchants by Process America and its agents. For example, a June 7, 2011 letter to Cynergy by Danelle Miller, a merchant, states that on April 29, a Process America employee, Scott Freedman, told her that "Cynergy went bankrupt and owes Process America millions of dollars." Although the letter itself would be inadmissible hearsay, Miller provided similar testimony in her deposition, namely that Freedman told her that "Cynergy was bankrupt" and Cynergy "owes Process America millions of dollars." Cynergy also cites a statement made to Miller by Michael Wolpin on February 7, 2011, that "Cynergy stole all the retention monies," but that she shouldn't worry because Process America still had her money. Further, an email from Mace Horowitz to a merchant on August 15, 2011 states that Cynergy has "run into financial difficulties recently which could effect [sic] your settlements in full or by delays" and links to an article discussing Cynergy's 2009 bankruptcy. A similar email sent on August 23, 2011 by another Process

America sales agent, Charge Card Systems, linked to the same article after referencing "issues surrounding your current processor's recent bankruptcy which has [sic] compromised the integrity of your merchant account."

Cynergy argues that these statements were false, because New Cynergy has never filed for bankruptcy since it was created in 2009, and because Process America, not Cynergy, held the merchant funds that Process America claimed Cynergy had stolen.  Cynergy further argues that these statements were defamatory *per se* because, under New York law, "statements which impugn the basic integrity, creditworthiness, or competence of [a] business are defamatory *per se*."  Croton Watch Co., Inc. v. National Jeweler Magazine, Inc., No. 06 CV 662, 2006 WL 2254818, at *4 (S.D.N.Y. Aug. 7, 2006) (collecting cases).

Process America does not dispute that it made the statements at issue, or that if false, those statements would be defamatory *per se*.  Nor does Process America argue that it made the statements without the requisite culpable mental state.  Instead, Process America's sole argument is that its statements were true.  See Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 301 (2d Cir. 1986).  The truth of a statement need not be established to a literal degree; rather, "[a]n alleged defamatory statement will be deemed to be substantially true, and hence 'not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation.'"  Croton Watch, 2006 WL 2254818 at *5 (quoting Guccione, 800 F.2d at 302).

Process America argues that its statements concerning Cynergy's bankruptcy were substantially true because it is a matter of public record that Cynergy entered bankruptcy in 2009.  Process America made the statements at issue in 2011.  It is undisputed that New Cynergy, a different entity, emerged from bankruptcy in October 2009 and has not filed for

bankruptcy since.  If the allegedly defamatory statements were simply that Cynergy had entered

bankruptcy, Process America might have been able to raise a fact issue by simply pointing out

that Old Cynergy did, in fact, enter bankruptcy in 2009.  That Old and New Cynergy were

different entities may seem an obvious distinction to an attorney, but conceivably it could be a

distinction without a difference for laypeople like the merchants who received these

communications.

 But the statements went much further than that – Process America (and / or its agents)

either explicitly stated or strongly implied that Cynergy's bankruptcy and financial problems

were a present concern.  Process America has not offered any evidence indicating that New

Cynergy was suffering from financial difficulties in 2011 – and it was Process America's burden

to provide such evidence, because "truth is a matter of affirmative defense under the common

law of defamation."  Law Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc., 844 F.2d

955, 958 n. 5 (2d Cir. 1988); see also, e.g., Ingber v. Lagarenne, 299 A.D.2d 608, 750 N.Y.S.2d

172 (3d Dep't 2002).  Process America has provided no evidence that, for example, merchant

settlements were actually in danger of being affected, or that the integrity of merchant accounts

was in jeopardy.  There is a substantial gap between the truth as described by Process America –

that Cynergy entered into bankruptcy in 2009 – and the allegedly defamatory statements – that

Cynergy entered into bankruptcy in 2009 and its current financial condition threatened the

business of merchants processing with Cynergy.

 This is not a case where "'the truth is so near to the facts as published that fine and

shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a

charge of libel.'"  Guccione, 800 F.2d at 303 (quoting Cafferty v. Southern Tier Publ'g Co., 226

N.Y. 87, 93, 123 N.E. 76 (1919)).  Process America and its agents told Miller and other

merchants that Cynergy was bankrupt and in financial distress at a time when New Cynergy was not bankrupt and, at least as far as the evidence in the record shows, not actually in financial distress.  The difference is particularly significant considering the audience to whom these statements were made:  merchants processing with Cynergy whose business could be threatened if Cynergy's ability to pay settlements was indeed in jeopardy.

No reasonable juror could find that Process America's statements "could have produced no worse an effect" on the mind of a reader or listener, and thus Process America's truth defense must fail.  Because Process America raises no other arguments in its defense, Cynergy is granted summary judgment as to liability on its counterclaim for defamation.

K.  Damages and Indemnification

The Court has held that both parties breached the ISO Agreement.  Although Process America breached by violating the Rules through its CRIP retention program, Cynergy improperly terminated the ISO Agreement without notice and opportunity to cure and therefore was not entitled to withhold residuals.  But the Court has also held that Process America violated the non-solicitation provision of the ISO Agreement, and defamed Cynergy.  Both parties are thus entitled to recover damages from the other; however, both parties dispute the other side's damages calculations.  The amount of damages owed by each party is a disputed issue of fact that requires trial.

Both parties claim that they are entitled to indemnification under Section 4.4 of the ISO Agreement based on the other party's breaches.  Section 4.4 holds both Cynergy and Process America broadly responsible for indemnifying the other party for, *inter alia*, "claims, demands, losses, damages, costs, fees or expenses (including . . . reasonable attorney's fees)" stemming from their breaches of the ISO Agreement.  Trial may result in one party owing more in damages

34

than it is entitled to in indemnification, thus mooting that party's indemnification claim.  The

Court therefore reserves judgment on the issue of indemnification until after trial on damages.

## CONCLUSION

For the reasons set forth above, the parties' cross-motions for summary judgment are

granted in part and denied in part.

**SO ORDERED.**


_____
                                             U.S.D.J.


Dated: Brooklyn, New York
       April 30, 2014