Michael C. Marsh

Akerman LLP
335 Madison Avenue
Suite 2600
New York, NY  10017
Tel:  212.880.3800
Fax:  212.880.8965

Dir:  305.982.5507
michael.marsh@akerman.com

July 30, 2014

**VIA ECF**

Honorable Brian M. Cogan, U.S.D.J.
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

Re:   **Process America, Inc. v. Cynergy Holdings, LLC,** *et al.***;**
      **Case No. 1:12-cv-00772-BMC**

Dear Judge Cogan:

  Defendant Cynergy Holdings, LLC ("New Cynergy"), hereby responds to Process America's July 25, 2014 Supplemental Letter in Response to New Cynergy's Motion in Limine [D.E. 150] ("Supplemental Response").  The Court already ruled that the damages limitation in Section 4.6 of the ISO Agreement is unambiguous, as Process America stipulated, and limits New Cynergy's liability to the fees derived during the last four months of the Agreement.  *See* July 21, 2014 Hearing Transcript (**Exhibit A**), at 2-4, 8.  The Court further found that Process America has provided no evidence that the limitation is unconscionable, that the parties had unequal bargaining power, or that New Cynergy committed acts rising to the level of willful misconduct.  In the Supplemental Response, Process America fails to present any evidence or law to warrant a departure from these rulings.  The Supplemental Response merely rehashes the arguments previously raised by Process America, which were rejected at the July 21 hearing.

  On July 18, 2014, New Cynergy requested that the Court enforce the damages limitation provision in the ISO Agreement.  *See* July 18, 2014 Letter [D.E. 146] ("Motion").  Process America responded to the Motion on July 20, 2014.  *See* July 20, 2014 Letter [D.E. 148] ("Response").  After full consideration of the Motion and Response, the Court granted the Motion at the Pretrial Conference on July 21, 2014.  *See* Hearing Transcript at 2-4, 8.  Upon request, the Court granted Process America special permission to file a supplemental brief.  *See id*. at 5-8.  New Cynergy was granted leave to reply.  *See id*. at 8.

  In the Supplemental Response, Process America raises five primary arguments in an effort to invalidate the damages limitation provision in the ISO Agreement.  Process America argues: (i) the Court has already ruled that it is entitled to collect all of its unpaid residuals and that New Cynergy is collaterally estopped from rearguing this; (ii) the ISO Agreement is an unenforceable contract of adhesion; (iii) New Cynergy's actions invoke the "reckless and willful misconduct" exception to the damages limitation; (iv) the damages limitation provision (Section 4.6) cannot be enforced because it conflicts with the residual payment provision (Section 6.4);

and (v) the "lost profits" Process America seeks are not barred because they are direct contract damages, not special or incidental damages.  As discussed below, none of these arguments invalidates the unambiguous limitations of liability set forth in Section 4.6 of the ISO Agreement.

I.  **The Court Never Ruled that Process America Can Collect a Specific Amount of Residuals.**

Process America spends the first three pages of its Supplemental Response arguing that New Cynergy is "collaterally estopped" by the "law of the case" from arguing that its liability is capped.  Process America misinterprets the Court's April 30, 2014 summary judgment ruling.  In its April 30, 2014 Decision and Order [D.E. 142], the Court did not make any ruling on limitations on damages.  Instead, the Court ruled that both parties breached the ISO Agreement.  Process America's CRIP program was a material breach.  Process America also violated the non-solicitation clause and defamed New Cynergy.  The Court further found that New Cynergy breached the ISO Agreement by not providing a notice and cure period to Process America prior to terminating the contract and residual payments.  The Court never ruled that Process America is entitled to recover any particular amount of residuals from New Cynergy.  Indeed, the Court specifically left open that issue for trial.  Thus, Process America's arguments regarding collateral estoppel and the law of the case should be summarily rejected.

II.  **The ISO Agreement Is Not a Contract of Adhesion.**

Process America argues that the ISO Agreement is a contract of adhesion because the parties had unequal bargaining power. The Court has already considered and rejected that argument, correctly noting that "[t]his was a commercial transaction between two sophisticated entities." *See* Hearing Transcript, at 3.  Indeed, "[t]ypical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms." *See Klos v. Lotnizce*, 133 F. 3d 164, 168 (2d Cir. 1997).  A contract of adhesion will <u>not</u> be found unless an agreement was coerced with high-pressure tactics or deceptive language, or was achieved only by fraud or overreaching.  *See id*. at 168-69; *see also Blake v. Biscardi*, 403 N.Y.S.2d 544, 546 (N.Y. App. Div. 1978) (courts generally are not receptive to pleas of unconscionability between merchants, and the doctrine is usually "applied in  litigation involving poor persons or otherwise disadvantaged victims" such as persons who are illiterate or don't speak the language of the contract).  It is only an "exceptional case where a commercial contract may be found unconscionable and against public policy." *TPK Constr. Corp. v. S. Am. Ins. Co.*, 752 F.Supp. 105, 110 (S.D.N.Y. 1990).

Here, the record is completely devoid of any evidence that Old Cynergy employed high pressure tactics or that grossly unequal bargaining power existed such that the parties' agreement in 2004 was tainted by adhesion. Craig Rickard, Keith Phillips and Kim Ricketts collectively negotiated the ISO Agreement, which also contains later-negotiated addenda.  *See* Rickard Depo. at 17-18 (excerpts attached as **Exhibit B**); Ricketts Depo. at 128 (excerpts attached as **Exhibit C**); ISO Agreement Addenda.  None of these executives has ever testified that they were forced, pressured or tricked into signing the ISO Agreement, that they could not negotiate the terms, that they were precluded from hiring counsel, or that there were no alternative companies with which they could have elected to conduct business as an ISO.  The fact that Process America claims

{29304701;2}   2

that it <u>chose</u> not to hire counsel to review the agreement when it was signed in 2004 does not render it unconscionable. *See Credit Alliance Corp. v. Joshco Mining Corp.,* 90 F.R.D. 187, 188 (S.D.N.Y. 1981) ("The mere assertions that the individual defendants did not read the contract, and were not represented by counsel does not warrant a finding of procedural unconscionability."); *Croote-Fluno v. Fluno,* 734 N.Y.S.2d 298, 300 (N.Y. App. Div. 2001) ("The fact that a party is not represented by an attorney in connection with the negotiation and execution of . . . [an] agreement is not fatal to its enforceability, especially where that party makes a conscious decision not to seek the assistance of counsel). Moreover, starting in 2007, the ISO Agreement was renewable annually. *See* ISO Agreement § 6.1. Process America ratified the agreement each year, never seeking to renegotiate the terms, even though Process America was represented by Alyssa Klausner and the law firm of Swedelson & Gottlieb as early as 2009, when Process America was involved in a dispute with Old Cynergy. *See* July 23, 2009 letter from A. Klausner to Old Cynergy (**Exhibit D**). In her affidavit, Ms. Klausner conveniently fails to advise the Court of the long-standing duration of her representation of Process America.

Process America also submits the affidavit of Keith Phillips, who claims that in 2004 Process America was a "neophyte" in the industry with no industry knowledge or understanding of the nuances of the ISO Agreement. *See* Phillips Affidavit (D.E. 150-1). Even if true, that is not sufficient to find a contract of adhesion. *See Klos v. Lotnizce,* 133 F. 3d at 168-169. Moreover, the record shows otherwise:

- Craig Rickard had knowledge of and worked in the credit card industry for years before entering into the ISO Agreement with Old Cynergy. Ricketts Depo. at 36; Phillips Depo. at 36-38.

- Process America started as a sales organization that directly solicited merchants, prior to becoming an ISO of Old Cynergy through the ISO Agreement. Phillips Depo. at 39-41 (excerpts attached as **Exhibit E**).

- Prior to signing the ISO Agreement, Process America already was a registered ISO with knowledge of the industry rules and regulations. Smith Depo. at 61-62 (excerpts attached as **Exhibit F**).

Process America was a sophisticated party when it entered into the ISO Agreement. Process America feigns ignorance, claiming that it would have been "madness" for them to enter into the damages limitation knowingly. *See* Supplemental Response at 9. That claim is further belied by Process America's own industry contracts. Process America asked merchants to sign agreements that included nearly identical limitations of liability, limiting Process America's exposure to one month of fees. Notably, Process America did not include any exception to its own damages cap in the event that it acted with gross negligence or willful misconduct. Process America's own limitation of liability provision reads:

> C. Limitation of Liability. Any liability of Processor [Process America] or Bank under this Agreement, whether to you or any other party, whatever the basis of the liability, shall not exceed in the aggregate the difference between (i) the amount of fees paid by you to Processor [Process America] and Bank during the month in which the transaction out of which the liability arose occurred, and (ii) assessments, chargebacks, and offsets against such fees which arose during such month. In the event more than one month is involved, <u>the aggregate amount of</u>

> <u>Processor's [Process America's] and Bank's liability shall not exceed the lowest amount determined in accord with the foregoing calculation for any **one month**</u> involved. Neither Processor [Process America] Bank nor their agents, officers, directors, or employees shall be liable for <u>indirect, special, or consequential damages</u>.

*See* sample Process America Merchant Processing Agreement (**Exhibit G**), at ¶ 9.C. (PA(CYN) 04493) (all emphasis added). Process America also insulated itself from special and consequential damage claims from its sales agents. *See* May 21, 2008 Independent Sales Agreement with Alternative Merchant Processing, Inc. (**Exhibit H**) at ¶ 18. Because Process America is a "signator[y] to a number of . . . agreements which contain [limitations of liability] similar to the instant one," this "allow[s] a conclusion that [Process America was] aware of its presence and effect in the [ISO Agreement]." *Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819, 828 (E.D.N.Y. 1995) "Therefore, it is difficult to conclude that [Cynergy] ha[s] taken advantage of [Process America's claimed] lack of knowledge and experience to any degree, much less one that could be considered unconscionable." *See id*.

For all of these reasons, Process America cannot show that Section 4.6 renders the ISO Agreement an unenforceable contract of adhesion.

**III.    The Reckless and Willful Misconduct Exception Does Not Apply**

Process America raises several theories in an attempt to invoke the reckless and willful misconduct public policy exception to the damages limitation. As explained in the Motion, and acknowledged by the Court during the July 21 hearing, "willful misconduct" is something more than an intentional breach of contract based on a business decision or profit. *See* Motion at 3 (citing authorities); Hearing Transcript at 4, 7. *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l Inc.*, 84 N.Y .2d 430 (1994), cited by the Court during the hearing, confirms the extraordinary level of misconduct necessary to invoke the public policy exception to contractual damages limitations. *See* Hearing Transcript at 4. In *Metropolitan*, a contractual damages limitation was enforced even where the evidence had shown that "the defendant abandoned the contract in order to shed itself of an unprofitable obligation, making itself more attractive to a potential acquirer, and the defendant knew that the plaintiff would suffer significant injury in that it would have to find another software system as a consequence of the breach." *See Five Start Dev. Resort Cmtys. v. iStar RC Paradise Valley, LLC*, No. 09 Civ. 2085(LTS), 2012 WL 4119561, at *4 (S.D.N.Y. Sept. 18, 2012) (*citing Metropolitan*, at 438-39). Despite the uniformity of the law on this subject, Process America ignores the multiple authorities cited by New Cynergy and instead misapplies the case cited by the Court – *Metropolitan.*

Process America argues that *Metropolitan* prohibits the enforcement of a one-sided damages limitation as inequitable. *See* Supplemental Response at 7, 9. To the contrary, the court in *Metropolitan* enforced the damages provision, which was drafted in favor of the defendant. The court noted that "[r]epeatedly throughout their Agreement here, the parties agreed to shift to plaintiff the risk of a substantial portion of any economic loss caused by defendant's nonperformance." *See id*. at 436. Nevertheless, the court enforced the damages limitation as-is, noting that "limiting defendant's liability for consequential damages to injuries to plaintiff caused by intentional misrepresentations, willful acts and gross negligence does not offend public policy" because "the conduct necessary to pierce an agreed-upon limitation of

liability in a commercial contract, must smack of intentional wrongdoing." *See id*. at 438 (internal quotations and citation omitted).

Process America further attempts to distinguish *Metropolitan* by arguing that it involved two sophisticated parties, whereas it claims Process America was not sophisticated. *See* Supplemental Response at 8. The Court already rejected this argument at the July 21 hearing, *see* Hearing Transcript at 3, and the argument is factually and legally unsound as discussed in Section II above.

In addition, Process America argues that, even if the damages limitation is enforceable, New Cynergy's actions in failing to provide a notice and cure period before withholding residual payments triggered the willful misconduct exception. *See* Supplemental Response at 9-11. As indicated by the Court, New Cynergy did not trigger this exception. *See* Hearing Transcript at 3. It was not clear that New Cynergy's termination without providing a notice and cure period was improper until the Court made that ruling on summary judgment. *See id*.

Process America also argues that Old Cynergy and New Cynergy knew about CRIP for some time, but failed to inform Process America that it constituted a breach of the Rules or ISO Agreement. *See id*. at 9. The Court already has recognized Old and New Cynergy as distinct entities. *See* September 2013 Summary Judgment Order at 13. Any allegations about Old Cynergy are irrelevant, and should be disregarded. Process America claims New Cynergy was scheming to "seize" the ISO/EP reserve. *See id*. at 10. The Court already ruled on summary judgment that New Cynergy currently has no obligation to pay the EP/ISO reserve to Process America. *See* April 30, 2014 Order at 25-26. The ISO/EP reserve was established by a Settlement Stipulation with Process America that was approved as part of Old Cynergy's bankruptcy. *See id*. at 10. Process America cites to a June 9, 2010 email that reveals New Cynergy's counsel's advice for finalizing the Settlement Stipulation. *See id*. (citing Exhibit L to Klausner Affidavit). The email was sent more than six months prior to New Cynergy's termination of the ISO Agreement due to Process America's material breach, and is being cited out of context. Indeed, the Settlement Stipulation was executed and approved by the bankruptcy court in June 2010. Thus, New Cynergy did not terminate based on the June 9 email cited by Process America. This email does not show willful misconduct by New Cynergy in connection with the February 2011 termination of the contract and residuals. New Cynergy terminated because Process America was wrongfully holding merchants' funds. Moreover, the email is protected by the attorney/client and work-product privileges, and was inadvertently produced to Process America during discovery. *See* July 30, 2014 Letter to M. Shapiro (**Exhibit I**). Instead of alerting New Cynergy, Process America now attempts to use the email – out of context – as a gotcha. Notably, New Cynergy has routinely and proactively alerted Process America to documents (including hundreds of documents produced on a thumb drive) that seemed to be privileged and inadvertently produced, and advised that they would not be viewed by New Cynergy's counsel.

Process America additionally complains that New Cynergy delayed advising Process America about the letter from Harris, the sponsor bank, that identified CRIP as a material breach. *See* Supplemental Response at 10. However, New Cynergy received the letter in January 2011, only one month prior to termination. Moreover, the Court already has recognized that any alleged delay in terminating Process America is immaterial because the ISO Agreement contains

{29304701;2}                                5

a non-waiver provision. *See* Sept. 23, 2013 Memorandum and Order at 13 (citing ISO Agreement § 7.5).

Process America further claims that is has evidence to show that New Cynergy had a "scheme" to terminate Process America so that New Cynergy could "takeover" the portfolio. Supplemental Response at 10-11. The portfolio was owned by New Cynergy. *See* Sept. 23, 2013 Memorandum and Order at 11. There was no need for a "takeover." Moreover, Process America's reliance on the alleged "evidence" of bad faith is misplaced. Process America cites to a March 10, 2011 email from Anthony Marino (at New Cynergy), but that email was almost one month <u>after</u> New Cynergy terminated the ISO Agreement. The email actually discusses Process America's wrongful solicitation of merchant accounts away from New Cynergy, and New Cynergy's efforts to mitigate the harm by retaining the merchants: "[I]t's likely they will move a lot of accounts. Let's try to intercept them if we can."

As "evidence" to support New Cynergy's alleged willfulness, Process America cites to the Affidavit of Alyssa Klausner, Process America's attorney. The majority of Ms. Klausner's affidavit is speculation, hearsay, and non-expert opinion testimony. As stated by Ms. Klausner, her declaration is "intended to cite and explain the record evidence that [she] believe[s] demonstrates Defendant New Cynergy's recklessness and gross negligence." Affidavit of A. Klausner at ¶ 1. Therefore, the Court should strike and disregard Ms. Klausner's Affidavit.

To the extent the Court considers the affidavit, it does not show that New Cynergy acted with willful misconduct by not providing a notice and cure period prior to terminating Process America. Ms. Klausner states that at some point during the negotiations <u>after</u> the termination letter, she reached the conclusion that New Cynergy was intent on disrupting Process America's ability to do business. Affidavit of A. Klausner at ¶ 14. Ms. Klausner's opinion about New Cynergy's intent is pure speculation. In addition, Ms. Klausner attests that New Cynergy's counsel admitted that New Cynergy withheld residuals to "break" Process America. *See* Supplemental Brief at 10. This is inadmissible hearsay, and sounds like part of a privileged post-termination settlement negotiation. In any event, as the February 17, 2011 termination makes clear, New Cynergy terminated the contract due to Process America's material breach. The Court has confirmed that Process America materially breached the ISO Agreement through CRIP, and that New "Cynergy's business was damaged as a result of the CRIP." *See* Sept. 23, 2013 Memorandum and Order at 13.

Finally, Process America cites to and attaches multiple lawsuits raising claims against Old Cynergy, New Cynergy, and a host of other defendants on various bases. Process America claims that these lawsuits are evidence of "a pattern of malicious, bad faith" conduct of New Cynergy. These allegations are completely irrelevant to New Cynergy's actions vis-à-vis the ISO Agreement and the limitation of liability provision.

Having been provided with an additional chance to convince the Court to reconsider its rulings set forth during the July 21 hearing, Process America remains unable to point to any record evidence demonstrating that New Cynergy acted with the type of willful misconduct or gross negligence that would pierce the damages limitation under established New York law. The damages limitation is clear, and it should serve its intended function to limit New Cynergy's liability in these circumstances, where Process America materially breached the parties' contract, and New Cynergy terminated that contract as a result.

### IV. Sections 4.6 and 6.4 Are Not Contradictory or Irreconcilable.

Process America raises various contract construction arguments, but there is no need to construe contract provisions that, as Process America has stipulated, are clear and unambiguous and which can be read in harmony with the balance of the contract. In fact, the Court already found that Section 4.6 is clear and unambiguous. *See* Hearing Transcript at 2-3. Moreover, Process America already stipulated that Sections 4.6 and 5.1 (which is similar to Section 6.4) are "clear and unambiguous." *See* Pretrial Stipulations of Law [D.E. 144-1] at 4. There is no need to resort to contract construction principles to interpret these clear contract provisions. They simply reflect the parties' agreement on how to allocate risk.

Process America further claims that Sections 4.6 (liability limitation) and 6.4 (residual payment provision) cannot be read harmoniously and must deal with separate subjects. *See* Supplemental Response at 5-6. That is not accurate. The provisions do not deal with separate subjects. The liability limitation survives termination of the ISO Agreement, *see id*. at § 7.11, and applies to post-termination residuals. The provisions are harmonious. Section 4.6 merely limits New Cynergy's potential exposure under Section 6.4 and does not altogether preclude Process America's recovery. Contrary to Process America's imagined hypotheticals, Section 4.6 does not permit New Cynergy to terminate the ISO Agreement for any reason at all and still limit its liability to pay residuals. As expressly stated in Section 4.6, and as required by New York law, the limitation applies only as long as New Cynergy's actions do not exceed the bounds of conscionability and public policy, of which there is no evidence in this case. The Court should disregard Process America's attempt to misapply select quotes from *Metropolitan*, as discussed in section III, *supra*.

Process America was entitled to receive residual payments from New Cynergy, unless it materially breached the ISO Agreement. ISO Agreement § 6.4. The Court has ruled that Process America materially breached the ISO Agreement by holding merchant reserve funds, which damaged New Cynergy. *See* Sept. 23, 2013 Memorandum and Order at 13; April 30, 2014 Decision and Order at 10-11. The Court also found that New Cynergy terminated the ISO Agreement due to that material breach, but did not comply with the notice and cure procedures. April 30, 2014 Decision and Order at 11, 15. New Cynergy stopped paying residuals after the termination because Process America materially breached the contract and damaged New Cynergy. This does not exceed the bounds of public policy and is not unconscionable. Therefore, Section 4.6 limits New Cynergy's liability for unpaid residuals to four months of fees.

### V. Process America's "Lost Profits" are Special/Consequential Damages.

Process America argues that New Cynergy should pay for the collapse of Process America's business. Process America claims that because it was not being paid by New Cynergy, it could not pay its agents, and thus its business failed. *See generally* Response. Process America contends that New Cynergy was its sole lifeline and should have known that not paying residuals would put Process America out of business. The facts do not support this argument. There is no evidence of which, if any, agents stopped doing business with Process America, or why. That is complete speculation. In addition, New Cynergy was not the only company paying residuals to Process America, which was also processing through Merrick Bank at the same time. *See* Rickard Depo. at 59-60 (Process America was signing merchants with

Merrick Bank before the termination); Feb. 3, 2011 email from Wolpin to merchant Danelle Miller. ("Just stop processing [with New Cynergy]. Gradually ramp up the Merrick account."). Process America alone made the decisions to spend merchants' reserve monies, pay its executives exorbitant salaries, and fail to save money to keep the business afloat.

The law does not support Process America's claim either. Process America cites to *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 2014 WL 1237514 (N.Y. March 27, 2014). *Biotronik* states that "[l]ost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are the direct and immediate fruits of the contract." *See id*. at 806. The distinction "is whether the lost profits flowed directly from the contract itself or were, instead, the result of a separate agreement with a non-party." *See id*. at 808. In *Biotronik*, an exclusive distributorship agreement was breached. The agreement itself used plaintiff's distributing resale price and profits as the benchmark for the payments under the agreement. *See id*. at 808. The agreement, therefore, clearly contemplated those profits and they were part of the negotiations and bargaining. *See id*.

In contrast, Process America claims lost profits from a "collateral business relationship" with third parties. Process America's relationships with its agents are collateral business relationships subject to Process America's separate agreements with those third parties. Those relationships are not governed by the ISO Agreement and they were not bargained for as part of the ISO Agreement. The ISO Agreement states that it "will not be deemed to be for the benefit of any third party." *See id*. at § 7.6. This situation is therefore akin to the *Biotronik* court's analysis of *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp .2d 314 (S.D.N.Y. 2009). *See id*. at 807. In *Compania*, the plaintiff sought "lost profits from lost sales to third-parties that [we]re not governed by the agreement" that had been breached. Therefore, the lost profits were ruled to be special/consequential damages because "as a result of the breach, the non-breaching party suffer[ed] loss of profits on its collateral business relationships," not lost profits stemming directly from the breached contract. Similarly, the lost profits sought by Process America are not a natural consequence of New Cynergy's breach of the ISO Agreement, but instead are the subject of collateral business relationships with agents. Based on the first sentence of Section 4.6, Process America's damages are limited to direct damages which are then further limited to four months of fees derived by Cynergy.

## VI. Conclusion

As the Court found during the July 21, 2014 hearing, Section 4.6 clearly and unambiguously limits New Cynergy's liability to the fees derived during the last four months of the ISO Contract. Process America has failed to cite any evidence or law warranting a departure from this ruling. The Court's well-reasoned ruling should therefore stand.

Respectfully submitted,

*Michael Marsh*
Michael C. Marsh
Jennifer C. Glasser

cc:    Mitchell Shapiro (via ECF)